## A02A2096. OLSON v. FORD MOTOR COMPANY et al.
### (575 SE2d 743)

BLACKBURN, Chief Judge.

Darrell Olson appeals the trial court's grant of summary judgment to appellees Ford Motor Company ("Ford") and Beaudry Ford, Inc. ("Beaudry"), arguing that there were genuine issues of material fact as to his revocation of his acceptance of the vehicle and as to appellees' breach of warranty and fraud. For the reasons set forth below, we affirm.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." *Lau's Corp. v. Haskins*.[1] So viewed, the evidence is that Olson, in order to save money and avoid the inconvenience of dealing with an automobile dealership, decided to purchase a Ford F-150 Lariat pickup truck through Georgia Cooperative Automotive Resources, Inc. d/b/a Credit Union C. A. R. ("C.A.R."), a vehicle-buying service company. Olson was to buy the pickup from C.A.R., which would order and take delivery of the truck. Olson's order was received on June 25, 1996.

Because he planned to use the pickup truck to launch his boat, Olson ordered a special towing package known as a limited slip rear axle. Olson was told by an employee of C.A.R. that a truck equipped with a limited slip rear axle would have to be custom-built for him at the Ford factory, and that it would take eight to ten weeks to deliver the truck.

After waiting for eight weeks, Olson called C.A.R. in August to inquire about the status of his truck order. He was told that the order would take an additional eight to ten weeks because of the popularity of the F-150 and because of production shortages. He was also told that Beaudry was the Ford dealership through which the truck had been ordered.

On November 25, 1996, C.A.R. called Olson to tell him that the pickup truck had arrived, and Olson picked up the truck the next day at C.A.R.'s office. Olson inspected the truck and found no apparent problems. He also reviewed the manufacturer's sticker on the truck

---

[1] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

window; the sticker indicated that the truck had a 3.55 ratio regular axle, which Olson mistakenly understood to mean that the truck had a limited slip rear axle.

Shortly after Olson took delivery of the truck, Olson got stuck in mud after pulling off the roadway; as a result, he called C.A.R. and told one of its employees that there was something wrong with the limited slip rear axle. The C.A.R. employee told him that the problem was not C.A.R.'s, and that he should call Beaudry. Olson called Beaudry and explained his concerns. Unable to determine over the phone whether Olson's truck had, in fact, a limited slip rear axle, an employee of Beaudry told Olson to bring the truck in so that it could be inspected by a mechanic.

Subsequent inspection of the truck revealed that it was not equipped with the limited slip rear axle but had, as indicated on the window sticker, a regular axle. Olson was told that the truck had been misbuilt but that Beaudry would take the steps necessary to install a limited slip rear axle. He was also told that the necessary paperwork and Ford's approval of corrective action would take time, and that he should continue to drive the truck until he received a call from Beaudry about installing a new rear axle.

While waiting to hear from Beaudry, Olson went to Wade Ford ("Wade"), a dealership closer to his home, and consulted them about his problem. The Wade service mechanic told Olson that he could fix the problem at that time if the car had been misbuilt. However, after seeing that the truck had the 3.55 ratio regular axle specified on the window sticker, the Wade mechanic told Olson that the truck was not misbuilt and said that he would have to talk with the service manager to see if he could do the work on the truck.

A few days later, the Wade mechanic called Olson and told him that Beaudry was acting to correct the problem and had contacted Ford in order to get a limited slip rear axle for the truck. Olson then spoke with the Beaudry service manager and told him that he wanted Wade to do the work for him because he did not trust Beaudry. The Beaudry service manager told him that Beaudry would have to do the work because Beaudry had delivered the truck. Olson said that he would continue to try to get Wade to do the work. Olson also contacted Ford customer service; he was told that any dealership could fix a vehicle which had been misbuilt.

Still wanting Wade to do the work, Olson called C.A.R. and asked again that something be done about his problem. A meeting was arranged, and Olson met with representatives of C.A.R. and his credit union on January 22, 1997. Though invited, representatives of Beaudry and Ford did not attend. At that meeting, Olson was given a set of documents and told that if the documents were sent to Wade, Wade would be able to do the work on his truck. Olson hand-delivered the documents to Wade in order to get the process started.

A few days later, an employee of Wade called Olson and told him that Wade could not work on his truck because it had been informed by Ford that the truck had not been misbuilt but had been misordered. Because the truck had been misordered, Beaudry, as the dealership that had ordered the truck, would have to do the work.

Olson called C.A.R. and informed its employee that he was returning the truck. A representative of C.A.R. called Olson back and informed him that problems such as his took time to resolve. He told Olson to bring the truck in and that C.A.R. would see to it that the problem was fixed. Olson said that he could not do that. On March, 18, 1997, Olson drove the truck to C.A.R.'s office; he left the truck in the parking lot and the keys with a receptionist.

Olson did not contact either Beaudry or Ford after returning the truck. He was contacted by a representative of his credit union who indicated that he would try to get Olson's problem resolved. Olson told the representative that he wanted a new truck, built as originally ordered, as well as payment of the legal fees he had incurred in trying to remedy the situation. The representative said that he thought that the parties could work out a solution but that Olson would have to pay for the 7,300 miles he had put on the truck. After Olson refused to pay for the mileage, no further attempts to resolve the problem were made.

In a single enumeration of error, Olson claims that the trial court abused its discretion by granting the appellees' motion for summary judgment where the record shows genuine issues of material fact as to his revocation of his acceptance of the goods, and as to the appellees' breach of warranty and fraud. We disagree.

1. Under OCGA § 11-2-608 a buyer may revoke his acceptance of goods whose nonconformity substantially impairs its value to him. Here, it is uncontroverted that the pickup truck with a regular axle did not conform with Olson's order specifying a pickup with a limited slip rear axle. Further, Olson's call to C.A.R. advising that he would be returning the nonconforming truck constituted a revocation of his acceptance of the Ford pickup. "However, a buyer who purports to revoke his acceptance of goods may be found to have re-accepted them if, after such revocation, he performs acts which are inconsistent with the seller's ownership of the goods." (Punctuation omitted.) *Fiat Auto U.S.A. v. Hollums.*[2] Subsequent to the phone call to C.A.R., Olson refused to allow C.A.R. to see to it that the truck was repaired, and also used his implied ownership of the truck in his negotiations with a credit union representative over final disposition of the truck.

---

[2] *Fiat Auto U.S.A. v. Hollums*, 185 Ga. App. 113, 115 (3) (363 SE2d 312) (1987).

In addition, the record shows that Olson has continued paying the note and the ad valorem taxes on the truck, and that he carries insurance on the truck. Olson's "various post-revocation acts constituted exercises in ownership by him and acts inconsistent with the seller's ownership. See OCGA § 11-2-606 (1) (c). Any action taken by the buyer, which is inconsistent with his claim that he rejected the goods, constitutes an acceptance." (Punctuation omitted.) Id. Because Olson's acts of ownership after informing C.A.R. that he would be returning the truck constituted, as a matter of law, reacceptance of the vehicle, there was no genuine issue of fact with respect to Olson's revocation of acceptance, and the trial court did not err in granting summary judgment.

2. Summary judgment was also proper as to Olson's claim of breach of warranty.

> [A] warranty contemplates that the warrantor shall have an opportunity to remedy defects. Thus the warranty is not instantly breached if the car is found on delivery or at some time thereafter within the warranty period to have a defective part or operational deficiency. The language of the warranty provides that in such event the manufacturer, through its selling dealer or other appointed agency, will replace or repair . . . and do what is necessary to bring the vehicle to normal at no cost to the purchaser. Assuming the purchaser has maintained his vehicle in the manner specified, it is the *refusal to remedy* within a reasonable time, or a *lack of success* in the attempts to remedy which would constitute a breach of warranty.

*Ford Motor Co. v. Gunn.*[3] In this case, Olson was told by Beaudry that it could replace the nonconforming axle, and that it would do so after proper authorization was received from Ford; however, Olson refused to let Beaudry fix the problem, insisting that another dealership do the work. Under these circumstances, where Beaudry neither refused nor failed to repair, the warranty cannot be deemed breached. *Versico, Inc. v. Engineered Fabrics Corp.*[4]

3. As to any genuine issues of fact regarding fraud on the part of the appellees, Olson fails to advance argument or cite to authority; accordingly, this portion of the enumeration of error is deemed abandoned. Court of Appeals Rule 27.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

---

[3] *Ford Motor Co. v. Gunn*, 123 Ga. App. 550, 551 (1) (181 SE2d 694) (1971).
[4] *Versico, Inc. v. Engineered Fabrics Corp.*, 238 Ga. App. 837, 842 (520 SE2d 505) (1999).

· DECIDED DECEMBER 13, 2002.

R. *Edward Furr, Jr.*, for appellant.
*Thomas, Kennedy, Sampson & Patterson, Thomas G. Sampson,
John K. Franks, Jeffrey E. Tompkins*, for appellees.