A04A1279. SIMPSON v. HYUNDAI MOTOR AMERICA, INC.
A04A1301. PHILLIPS v. HYUNDAI MOTOR AMERICA, INC.
(603 SE2d 723)

ANDREWS, Presiding Judge.

Angela Simpson and Tina Phillips appeal from the trial court's grants of summary judgment to Hyundai Motor America, Inc. (HMA) in their separate suits pursuant to the Magnuson-Moss Warranty Act[1] (the Act) and Georgia law claiming breach of express warranty, breach of implied warranty, and revocation of acceptance. Because several of the issues raised in both cases[2] are identical, the cases have been consolidated for purposes of appeal.

On appeal from the grant of a motion for summary judgment, we conduct a de novo review of the law and evidence, viewing the evidence in the light most favorable to the nonmovant, to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law. *Holbrook v. Stansell*, 254 Ga. App. 553-554 (562 SE2d 731) (2002).

---

[1] See 15 USC § 2301 et seq.
[2] The same attorneys represent both plaintiffs, and HMA is represented by the same attorneys in each case.

*Case No. A04A1279*

In October 2001, Simpson purchased a 2001 Hyundai Accent with manual transmission from HMA dealer Courtesy Hyundai for $12,500. Simpson received with her vehicle the 2001 Accent Owner's Handbook, which contained the "Hyundai New Vehicle Limited Warranty." That limited warranty, for 60,000 miles or 60 months, whichever came first, provided that:

**HYUNDAI NEW VEHICLE LIMITED WARRANTY**
**WARRANTOR**
Hyundai Motor America (HMA) warrants your new 2001 Hyundai vehicle pursuant to the limited warranties described in this handbook. . . .
**YOUR RIGHTS**
These stated warranties give you specific legal rights. . . . INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF TIME, INCONVENIENCE, LOSS OF USE OF THE VEHICLE, OR COMMERCIAL LOSS ARE NOT COVERED UNDER THIS WARRANTY.
**WHAT IS COVERED** — Repair or replacement of any component originally manufactured or installed by Hyundai Motor Company or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance, except any item specifically referred to in the section "What is Not Covered."

The Handbook also provided, in compliance with the Act, an alternative dispute resolution program for customers' warranty complaints. This program is the Better Business Bureau (BBB) Auto Line Program. Also, the Handbook states that Auto Line must be used prior to initiating court action pursuant to the Act. The maximum relief available under Auto Line is the repurchase or replacement of the vehicle.

On December 27, 2001, Simpson took her Accent to the dealer with complaints regarding the transmission, sound system, an unidentified noise, and a loose floor mat. The Accent had 3,784 miles on it. According to the repair order, repairs worth over $400 were made to the car. Simpson acknowledged that service was performed and the problem with the transmission was temporarily solved.

On April 4, 2002, Simpson returned to the dealership because the transmission would not stay in reverse. The Accent had 6,980 miles at that time. Repairs worth over $250 were made, including the replacement of fifth and the reverse hub, at no charge to Simpson.

On June 12, 2002, Simpson returned to the dealership with complaints of grinding when shifting into second gear. There were 9,616 miles on the car. The entire transmission was replaced, at no cost to Simpson.

On June 18, 2002, Simpson contacted the BBB Auto Line Program, complaining of a defective transmission. She did not return to the dealer for further repairs. Also, on June 18, 2002, Simpson, through her counsel, sent a letter to HMA purportedly revoking acceptance of the Accent.

On June 27, 2002, prior to any sort of resolution pursuant to the BBB Auto Line Program, HMA offered, through BBB, to replace the Accent or repurchase it for $11,809.01, which included a setoff of the $500 rebate Simpson had gotten when purchasing the car as well as a mileage setoff of $1,095.64. Simpson rejected this offer.

Simpson continues to drive the Accent, make payments on it, insure it, and pay ad valorem taxes on it. As of her deposition on February 6, 2003, Simpson had driven the Accent over 13,000 miles following her attempted revocation of acceptance on June 18, 2002.

The Accent was inspected by Ben Hall, the District Parts and Service Manager for HMA, on April 2, 2003. He opined that, in his expert opinion, the Accent performed like any other 2001 Hyundai Accent and was not defective in any way.

*Case No. A04A1301*

On September 29, 2001, Phillips purchased a 2002 Hyundai Sonata with automatic transmission from Rick Case Hyundai for $23,749.52. Phillips received her 2002 Owner's Handbook and Warranty Information Manual, which also contained the Hyundai New Vehicle Limited Warranty. Phillips received the Manual and acknowledged that representations made regarding the warranty influenced her decision to purchase the Sonata. The Limited Warranty was the same as that contained in Simpson's Manual, set out above, except it referred to a 2002 Hyundai vehicle.

The dealer, Rick Case, did not provide an express warranty and in fact disclaimed all warranties, including express warranties and the implied warranty of merchantability. This disclaimer is on the front page of the purchase contract, immediately above Phillips' signature. At the time of the purchase, Mancell Roby, Phillips' uncle who co-signed for the car, also purchased a Cost Guard Vehicle Service Agreement. This agreement was between Roby and Acceleration National Service Corporation.

On January 11, 2002, Phillips took her car, with 5,984 miles on it, into Rick Case for a nonworking right rear brake light. The problem was corrected at no cost to Phillips and she acknowledged

that it was repaired. On February 18, 2002, Phillips returned to Rick Case complaining that there was a ticking noise while the Sonata was running and that the transmission was jerking from first to second gears. There were 6,708 miles on the car. Phillips returned to Rick Case on March 25, 2002, reporting a clicking noise while idling and the transmission continued to shift very hard. She was provided a rental car and the clicking was diagnosed as a problem with the drive belt, which was replaced at no cost to her. The mechanic who test drove the car was unable to duplicate any shifting problem. Phillips returned with the car on March 28, complaining that the transmission was still not shifting right. The transmission fluid was drained and replaced, at no charge. On April 4, 2002, a fog light bulb was replaced on the driver's side.

On August 29, 2002, with 15,217 miles on the Sonata, Phillips took it to Jim Ellis Hyundai with a number of electrical complaints, as well as again stating that the transmission was shifting hard. The ETAC module and sunroof relay were replaced. Also, the fuse box was damaged and it and all fuses were replaced. The transmission fluid was low and was topped off. Phillips was provided with a rental car and the repairs, worth over $1,000, were all covered by her warranty.

On November 1, 2002, Phillips returned to Jim Ellis with her sunroof inoperable, lights flickering inside the dash, headlights flickering, and the transmission still shifting roughly. Phillips was provided a rental car and a wiring harness was specially ordered for the sunroof. The battery was replaced, but the technician found the transmission operating to manufacturer's specifications. On November 21, the wiring harness was installed. On December 30, 2002, Jim Ellis replaced the headlights on Phillips' Sonata after finding they had internal failure.

The car had 20,553 miles at this time.

On November 22, 2002, Phillips, through counsel, sent a letter to HMA purportedly revoking acceptance of the Sonata. On December 2, 2002, Phillips contacted the BBB Auto Line Program, stating that the Sonata had transmission, electrical, engine, and brake problems. On December 23, 2002, prior to any resolution by the BBB Auto Line Program, HMA notified Phillips through the Auto Line Program that it would replace or repurchase the Sonata. HMA agreed to repurchase the car for $23,749.52 minus an offset for mileage. This offer was rejected, although at her deposition on June 17, 2003, Phillips stated she had been unaware of this offer and its rejection. In an affidavit of October 3, 2003, Phillips averred that she had been well aware of the offer and decided to reject it.

Phillips still drives the Sonata, makes payments on it, insures it, and pays ad valorem taxes on it. As of July 30, 2003, when the Sonata was inspected by Hall, the District Parts and Service Manager for

HMA, the car had 33,738 miles on it. Hall drove the car for approximately two and one-half hours and found it performed as expected and as any other 2002 Hyundai Sonata would perform. He inspected the transmission and found no problems and no transmission codes indicating any problems. He inspected the engine and found no problems and no engine codes indicating any problems. He did not hear any abnormal noise from the engine. Hall also inspected the electrical system, including the battery, charging system, lights, turn signals, brake lights, head lights, and hazard lights. He found the dome lamps and sunroof working properly. The radio and alarm system worked properly. Although the front right fog light was out, it was a burned out bulb, which is routine maintenance and not covered by warranty.

Also, Hall examined the oil in the Sonata and found it to be extremely dirty. Oil sludge he found indicated that there had been a failure to maintain the car. The air filter needed replacing and the oil sticker in the car stated that it was due for an oil change at 25,098 miles, although at the time of Hall's inspection, the car had 33,738 miles on it. Further, the tire wear indicated the tires had not been properly rotated and needed to be replaced and there was improper air pressure in all the tires.

1. Both Simpson and Phillips, in their first enumerations, argue that summary judgment on their express and implied warranty claims was error because they had come forward with evidence to show breaches.

(a) We consider first their claims under the express Limited Warranty set out above. In *Versico, Inc. v. Engineered Fabrics Corp.*, 238 Ga. App. 837, 842 (3) (520 SE2d 505) (1999), citing *Benning Constr. Co. v. Lakeshore Plaza Enterprises*, 240 Ga. 426, 429 (241 SE2d 184) (1977), and *Space Leasing Assoc. v. Atlantic Bldg. Systems*, 144 Ga. App. 320 (241 SE2d 438) (1977), we held that the breach of an express warranty to repair or replace did not occur until the warrantor refused to perform further repairs. As *Versico* explained, since an express warranty contemplates that the warrantor have an opportunity to remedy any defects, the breach of that warranty does not occur until the warrantor either refuses to remedy the defects or is unsuccessful in remedying the defects. *Ford Motor Co. v. Gunn*, 123 Ga. App. 550, 551 (1) (181 SE2d 694) (1971).

As stated in *Ford Motor Co. v. Gunn*,

[t]he warranty contemplates that the warrantor shall have an opportunity to remedy defects. Thus the warranty is not instantly breached if the car is found on delivery or at some time thereafter within the warranty period to have a defective part or operational deficiency. The language of the

warranty provides that in such event the manufacturer, through its selling dealer or other appointed agency, will replace or repair (except those items and adjustments expressly excluded), and do what is necessary to bring the vehicle to normal at no cost to the purchaser. Assuming the purchaser has maintained his vehicle in the manner specified, it is the *refusal to remedy* within a reasonable time, or a *lack of success* in the attempts to remedy which would constitute a breach of warranty.

See also *Olson v. Ford Motor Co.*, 258 Ga. App. 848, 851 (2) (575 SE2d 743) (2002), and *DeLoach v. Gen. Motors*, 187 Ga. App. 159 (3) (369 SE2d 484) (1988).

Both Simpson and Phillips acknowledge that they did not return to an authorized dealer for the purpose of allowing a final attempt to repair. Further, as set out above, Hall, HMA's expert, conducted thorough inspections of Simpson's Accent and Phillips' Sonata in April and July 2003, respectively, and found them both functioning properly.

In the face of this evidence, Simpson and Phillips have failed to come forward with any evidence[3] of defects or refusal to repair or lack of success in repairing by HMA except their own opinions that their cars are defective. As in *Aldridge v. King's Colonial Ford*, 250 Ga. App. 236 (550 SE2d 439) (2001), plaintiffs here failed to create an issue of fact in the face of Hall's expert opinion and summary judgment for HMA on their express warranty claims was proper. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

(b) Simpson and Phillips also argue that summary judgment was improperly granted to HMA on their implied warranty claims.

In Georgia, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." OCGA § 11-2-314 (1). This warranty protects consumers from "defects or conditions existing at the time of sale." *Jones v. Marcus*, 217 Ga. App. 372, 373 (1) (457 SE2d 271) (1995). Therefore, proof that the Accent and Sonata were defective *when sold* is an essential element of Simpson's and Phillips' claims. *Dildine v. Town & Country Truck Sales*, 259 Ga. App. 732 (1) (577 SE2d 882) (2003); see also *Griffith v. Med. Rental Supply &c.*, 244 Ga. App. 120, 122 (534 SE2d 859) (2000) (defect must exist at time of sale or lease for valid breach of implied warranty claim); *Jenkins v. Gen. Motors Corp.*, 240 Ga. App. 636, 638 (5) (524 SE2d 324) (1999) (same).

---

[3] The issue of Dickerson's affidavit is discussed hereinafter.

Simpson purchased her Accent on October 15, 2001, but no problems were reported by her until December after the car had been driven 3,784 miles. Phillips bought her Sonata on September 29, 2001, but made no complaints until January 2002 after she had driven it 5,984 miles.

To find a defect in either vehicle on the date of purchase would require the jury to rely on speculation or conjecture, improper bases for imposing liability. *Dildine v. Town & Country*, supra at 734.

There was no error in the trial court's grants of summary judgment to HMA on Simpson's and Phillips' implied warranty claims.

2. As part of her first enumeration of error, both Simpson and Phillips contend that the trial court erred in granting HMA's motions to strike their personal affidavits regarding the value of their cars. Phillips' enumeration also alludes to the trial court's striking of evidence, i.e., the affidavits of Dickerson and that of Joseph Pennacchio.

As pointed out by HMA, in Phillips' case, Dickerson was withdrawn by her as an expert on October 23, 2003, prior to the taking of his deposition. Therefore, his previously signed affidavit could not be considered under any circumstances. See OCGA § 24-9-67; *Saltis v. A.B.B. Daimler Benz (North America N.O., Inc.)*, 243 Ga. App. 603, 606 (1) (533 SE2d 772) (2000).

Simpson's first enumeration, unlike that of Phillips, does not refer to improper admission of evidence. Therefore, her enumeration does not identify the trial court ruling asserted to be error and will not be considered here. *Felix v. State*, 271 Ga. 534, 539, n. 6 (523 SE2d 1) (1999).

Because, as set out in Division 1, neither Simpson nor Phillips withstood the motions for summary judgment of HMA regarding their causes of action, the issue of their affidavits regarding damages is moot. See *Richmond County Business Assn. v. Richmond County*, 222 Ga. 772, 773 (152 SE2d 738) (1966).

Regarding the affidavit of Pennacchio, the arguments made here by Phillips regarding the admissibility of his opinion were not, as far as the record here reveals, made below and they will not be considered here for the first time. *Pfeiffer v. Dept. of Transp.*, 250 Ga. App. 643, 647 (3) (551 SE2d 58) (2001); *Dildine v. Town & Country*, supra at 735 (3).

Further, admission of evidence lies within the sound discretion of the trial court and there has been no showing of abuse of that discretion. *Dept. of Transp. v. Mendel*, 237 Ga. App. 900, 902 (2) (517 SE2d 365) (1999).

*Judgments affirmed. Miller and Ellington, JJ., concur.*

DECIDED AUGUST 20, 2004.

*Krohn & Moss, Adam Krohn, Amy M. Budow, Eric S. Fortas, Scott M. Cohen, Shireen Hormozdi,* for appellants.

*McKenna, Long & Aldridge, Jill C. Kuhn, Jeremy M. Moeser, Charles K. Reed,* for appellee.