A10A2320. MAUK v. PIONEER FORD MERCURY et al.

(709 SE2d 353)

BARNES, Presiding Judge.

Sheila Mauk bought a new Mustang in May 2007, and within three weeks brought it back to the dealership, Pioneer Ford Mercury, with complaints about the transmission. Over the next nine months Mauk brought the car back to the dealer for service eight times, but her complaints were not resolved, and in February 2008 she sent a letter to Pioneer, Ford Motor Company, and the lender SunTrust Bank seeking to revoke her acceptance of the car under OCGA § 11-2-608 of the Uniform Commercial Code. Mauk then filed a complaint against the three entities in May 2008, seeking damages and relief from her installment contract, and this litigation ensued. The trial court granted summary judgment to Pioneer and SunTrust on Mauk's claim for damages from Pioneer's failure to accept her revocation of the contract, and Mauk appeals. For the reasons that follow, we reverse the trial court's summary judgment to Pioneer and SunTrust on this claim.[1] In so doing, we overrule the case on which the trial court understandably relied, *Scott v. Team Toyota*, 276 Ga. App. 257, 259 (4) (622 SE2d 925) (2005).

On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Ford v. Bank of America Corp.*, 277 Ga. App. 708 (627 SE2d 376) (2006). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Wachovia Bank v. Moody Bible Inst. of Chicago*, 283 Ga. App. 488, 489 (642 SE2d 118) (2007).

---

[1] Mauk's warranty claims remain pending in the trial court.

1. Mauk bought a new Mustang in May 2007, financing it with a six-year loan from SunTrust with payments of $587 per month. In February 2008, Mauk's attorney sent a certified letter to Pioneer, SunTrust, and Ford revoking her acceptance of the car. In the letter, Mauk sought the return of the money she had paid for the car to date and also sought $1,000 in attorney fees to settle all of her claims against the three entities. The trial court held that this revocation was not an "unconditional tender" of goods back to the seller, which we held in *Scott* was required to revoke the acceptance of noncomforming goods under OCGA § 11-2-608 of the UCC.

*Scott* reviewed both a claim for damages due to fraud and a claim for damages resulting from the delivery of nonconforming goods. In Division 1, we held that a party electing to rescind a contract for fraudulent inducement under OCGA § 13-4-60 must tender any benefits received before bringing the action. 276 Ga. App. at 258 (1). We then held that the offer to restore the consideration received under the contract must be "unconditional and certain." In Division 4, addressing Scott's UCC claim under OCGA § 11-2-608, we held that she "did not tender the [goods] back to [the seller] in accordance with the requirements of Georgia law," and referred to Division 1. Id. at 259 (4).

Mauk does not claim fraud, and therefore the requirements for contract rescission on that basis are not before us. As to Mauk's UCC claim, however, the buyer need not tender nonconforming goods as a condition precedent to a claim based on a revocation of acceptance theory of recovery, much less make an unconditional tender. OCGA § 11-2-608 provides:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it. . . .
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer *notifies* the seller of it.
>
> . . .

(Emphasis supplied.) The condition precedent to a claim for damages due to the seller's failure to accept the buyer's contract revocation under OCGA § 11-2-608 (2) is that the buyer give the seller notice of the revocation within a reasonable time and before the condition of the goods changes substantially from unrelated causes. See *Fiat Auto U.S.A. v. Hollums*, 185 Ga. App. 113, 114-115 (3) (363 SE2d 312)

(1987) (letter recounting car troubles and asking manufacturer to take back the car and refund money paid was sufficient to constitute revocation of acceptance).

Further, other provisions of the UCC support the conclusion that tender is not required to revoke acceptance under OCGA § 11-2-608. OCGA § 11-2-608 (3) gives the buyer the same rights and duties regarding the goods as she would have if she had rejected them, and OCGA § 11-2-602 (2) (b) requires the buyer to hold the nonconforming goods with reasonable care for a time sufficient to permit the seller to remove them. Finally, if a buyer justifiably revokes her acceptance, OCGA § 11-2-711 (3) grants the buyer a security interest in the noncomforming goods for certain payments and expenses incurred, and even allows the buyer to resell the goods under certain circumstances. All of these provisions are inconsistent with requiring a tender to revoke a contract for the sale of nonconforming goods under the UCC.

Additionally, in the context of a sale of goods, the UCC specifically addresses the seller's duty to tender the goods and the seller's right to cure a nonconforming tender of goods if the contracted time for performance has not expired. OCGA §§ 11-2-507 and 11-2-508. We thus regard the absence of a tender requirement in OCGA § 11-2-608 (2) as a deliberate matter of considered choice. See *Padgett v. City of Moultrie*, 229 Ga. App. 500, 503 (1) (494 SE2d 299) (1997); *Dept. of Human Resources v. Hutchinson*, 217 Ga. App. 70, 72 (1) (456 SE2d 642) (1995).

While we have found no Georgia cases specifically holding that tender is not required to revoke the acceptance of goods under OCGA § 11-2-608 of the UCC, other jurisdictions have addressed the issue directly.

> A tender of the goods by the buyer to the seller is not an essential element of revocation. All that is required by the Code is a notification of revocation. The Code declares that notification is not effective until notice is given and by necessary implication states that there is a sufficient revocation of acceptance when a "notice" is given even though the buyer still has possession of the goods and even though he does not make any tender of the goods to the seller. The concept of revocation of acceptance is not to be confused with rescission. . . . Anderson, Uniform Commercial Code, § 2-608.18 (2d ed. 1971)[.]

*Snow v. C.I.T. Corp. of the South*, 647 SW2d 465, 467 (Ark. Ct. App. 1983). See also, e.g., *Mobile Homes Sales Mgmt. v. Brown*, 562 P2d 1378, 1381 (Ariz. Ct. App. 1977) (any previous "tender back require-

ment has now been eliminated by the adoption of the UCC"); *Art Hill v. Heckler*, 457 NE2d 242, 245 (Ind. Ct. App. 1983) (buyer may revoke acceptance of goods without physically returning them to seller).

In this case, Mauk seeks damages for Pioneer's failure to accept her attempted revocation under OCGA § 11-2-608 of her automobile purchase. Because the UCC does not require that a buyer tender nonconforming goods to effect the revocation of a sales contract, that portion of *Scott* holding otherwise is hereby overruled.

2. The trial court noted in its order on summary judgment that, absent the controlling precedent of *Scott*, it would have concluded that questions of fact remain for the trier of fact regarding whether Mauk's revocation was timely and whether the alleged defects substantially impaired the car's value to her. Pioneer and SunTrust argue that, regardless of whether Scott's attempted revocation was proper, evidence the car had more than 12,000 miles on it when tendered and was driven more than 4,000 miles after the tender constitutes reacceptance as a matter of law. We agree with the trial court that whether Mauk's revocation was timely, whether she reaccepted the car, and whether the alleged defects substantially impaired the car's value to her were questions of fact for the jury to decide.

A buyer who purports to revoke acceptance of goods may be found to have reaccepted them if, after such revocation, the buyer performs acts inconsistent with the seller's ownership of the goods. *Griffith v. Stovall Tire & Marine,* 174 Ga. App. 137, 138 (1) (329 SE2d 234) (1985) (evidence buyer refused to allow seller access to repair vehicle with 120,000 miles, absent responsive evidence from buyer, was sufficient for summary judgment). See also *Small v. Savannah Intl. Motors*, 275 Ga. App. 12, 13-14 (1) (619 SE2d 738) (2005) (summary judgment properly granted to seller because evidence showed buyer did not seek revocation until she was unable to trade in car that she discovered had been flooded, and buyer's husband liked the car and continued to drive it); *Olson v. Ford Motor Co.*, 258 Ga. App. 848, 850 (1) (575 SE2d 743) (2002) (summary judgment properly granted to seller on buyer's revocation claim, because evidence showed buyer used vehicle ownership to negotiate with credit union and took other actions consistent with reacceptance); *Fiat*, 185 Ga. App. at 115 (3) (directed verdict properly granted to seller on buyer's revocation claim upon evidence buyer drove car more than 6,000 miles after repairing it and painting it another color).

Here, Pioneer and SunTrust argue that Mauk reaccepted the car because she continued driving it for 4,000 miles after sending the revocation letter in February 2008. First, the evidence in that regard is equivocal. The service order dated February 27, 2008 showed that

the car had 14,379 miles on it. When asked at her deposition in December 2008 how many miles were on the car, Mauk replied, "It's right at 18,000, and I want to say maybe 18,200 — I hadn't been in it, so I'm not exactly sure. . . . I'm going to say nine months it's sat in the garage." Second, continued use of a car is not necessarily inconsistent with a revocation of acceptance. *Franklin v. Augusta Dodge*, 287 Ga. App. 818, 820-821 (1) (652 SE2d 862) (2007). When asked about the car having 14,000 miles on it in less than a year despite all the problems she had experienced with it, Mauk explained that it had been her family's primary car.

In *Franklin*, we reversed a trial court's directed verdict on a revocation claim although the buyer put 32,000 more miles on the car after the seller ignored his attempted revocation. The buyer testified he continued to use and pay for the vehicle because he could not afford to buy another truck while trying to resolve the problems with the one at issue and he had no other feasible means of transportation. Id. at 819. See also *Mitchell v. Backus Cadillac-Pontiac*, 274 Ga. App. 330, 334-335 (2) (618 SE2d 87) (2005) (buyer's continued possession of vehicle dealer would not take back did not warrant directed verdict on rescission claim); *Reeb v. Daniels Lincoln-Mercury Co.*, 193 Ga. App. 817, 818-819 (1) (389 SE2d 367) (1989) (directed verdict on revocation claim error because questions of fact about timeliness of revocation and impairment of goods).

In this case, questions of fact exist about whether Mauk's revocation was timely, whether she reaccepted the car after her tender, and whether the alleged defects substantially impaired the car's value to her. She testified that she stopped driving it after numerous unsuccessful attempts to have it repaired because the clutch continued to pop out of gear unexpectedly, chatter, and release a burning odor that made the car smell "like a dead dog." She first returned the car to the dealer three weeks after she bought it in May 2007 because it had popped out of gear and was making noise, and the dealership lubricated and adjusted the front bushings and sway bar. She brought it back less than a week later and the dealership said the noise was normal for the Tremec 5-speed manual transmission installed in the car. She brought it back again at the end of June 2007, and the dealership replaced the clutch disc, but the problem was "a lot worse" and in mid-July Mauk returned with the same complaints. The repair ticket for that visit indicated the service technician could find nothing wrong with the car, so according to Mauk, Pioneer left a "ticket open" for her to return so the dealer could try again to correct the problems. When Mauk brought the car back ten days later, complaining that the clutch slipped and chattered, she was again told that the noise was normal for her type of transmission.

A week later in early August 2007, Mauk returned, complaining that the vehicle popped when backing up and down hills and that she could smell an odor from the clutch, but once again Pioneer said it could not find any problem with the transmission or clutch despite having a "team of specialists" examine the car. The dealership told Mauk it would not work on it again for this issue because the car's characteristics were normal.

Three weeks later, in August 2007, Mauk took the car to another dealership for a second opinion, complaining that the clutch chattered, jumped, and "popped" in forward and reverse. A technician there said the noise had been caused by a loose flange nut where the driveshaft attached to the transmission, which they tightened. Mauk returned to the other dealer within a week because the clutch was still chattering "very badly" and causing the car to stall in stop-and-go traffic. She had been stranded three times when the clutch became hot and the car died, and her daughter was concerned about her driving it. The dealer kept the car for about a week or two and replaced the entire clutch assembly.

Mauk continued having problems with the car, and finally contacted Ford customer service to say she was "very disappointed" in the Mustang, that she had driven straight-shifts before, and that she did not believe that the popping was a "normal, standard noise." All she wanted was for it to be fixed. In November 2007, Mauk brought the car back to Pioneer after Ford set up a "final repair attempt." According to the repair ticket, Mauk complained that the transmission was making a "clunking noise, pops, and has jumped out of first gear" but the same engineer who had examined the car before could not repeat the problem and again noted that the noise was a "normal characteristic of this transmission, as it is performance oriented."

After that, Mauk did not complain to Pioneer again about the transmission and noise problems, because she had been advised that the dealership "could not touch it" after the Ford engineer said the noise was normal. Thus, when she took her car to Pioneer on February 7, 2008 for maintenance work under the warranty, the service ticket made no mention of these problems. Mauk took the car to a transmission specialist on February 14, 2008, who told her that the popping, whining noise was not "correct," and on February 22, 2008, Mauk's attorney sent the certified letter to Pioneer, SunTrust, and Ford revoking her acceptance of the car. Mauk took the car to Pioneer on February 27, 2008 for the last time, and the dealer replaced a belt, fixed her backup lights, and replaced a window regulator. In April or May 2008, Mauk parked the car for good because she had gone down "every avenue" and no one could or would fix it.

Mauk's transmission specialist testified that when he drove the car in February 2008, it made a lot of noise. While it did not jump out of gear when he tested it then, it was popping, the clutch was chattering in reverse, and the back-up lights were not working. Mauk brought it back to him on July 9, a few weeks before he was deposed, and the specialist "did get it to jump out of fifth gear." He testified that the car was probably jumping out of first and fifth gear. because the gear shift shaft was not clearing the rim of the console properly, and if the driver's hand was not on the gear shift knob, sudden acceleration or deceleration could knock the shaft against the rim and take the car out of gear. He also thought the popping noise was coming from a body part. A complete diagnosis and repair would require disassembling the transmission, because no one could tell from the outside what was wrong with the inside, but he thought the cause was a manufacturing defect, based on Mauk's statement that the car had had this problem since it was new.

> [I]ssues such as whether an effective revocation of acceptance was made, whether reasonable notice of revocation was given to the seller, and whether the value of the goods was substantially impaired are ordinarily matters for determination by the trior of fact, even where the buyer has continued to use nonconforming goods after an alleged revocation of acceptance. *Trailmobile Div. of Pullman v. Jones*, 118 Ga. App. 472, 474 (164 SE2d 346) (1968); *Jacobs v. Metro Chrysler-Plymouth*, 125 Ga. App. 462 (188 SE2d 250) (1972); *Hub Motor Co. v. Zurawski*, 157 Ga. App. 850, 851 (278 SE2d 689) (1981).

*Griffith*, 174 Ga. App. at 139 (1). Based on the evidence outlined above, we agree with the trial court that, absent the directive of *Scott*, questions of fact exist for the trier of fact.

Accordingly, we reverse the trial court's grant of summary judgment to Pioneer and SunTrust on Mauk's claim for damages resulting from the dealership's failure to accept her revocation of the sales contract.

*Judgment reversed. Ellington, C. J., Smith, P. J., Miller, P. J., Phipps, P. J., Andrews, Mikell, Adams, Doyle, Blackwell, Dillard and McFadden, JJ., concur.*

DECIDED MARCH 28, 2011.

*T. Michael Flinn*, for appellant.
*Owen, Gleaton, Egan, Jones & Sweeney, Philippa V. Ellis, Ana*

*M. Martinez, Melissa Phillips Reading, Casey Gilson, Karen R. Dunbar, Stacey K. Hydrick*, for appellees.